IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JAMES MUNSON, IDOC # N95249,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )   CIVIL NO. 10-881-GPM |
| | ) |
| **DONALD GAETZ, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

# <u>MEMORANDUM AND ORDER</u>

**MURPHY, District Judge:**

Plaintiff James Munson, a prisoner in the custody of the Illinois Department of Corrections ("IDOC") who currently is serving a sentence of life imprisonment at the Menard Correctional Center ("Menard") for murder, brings this action pro se pursuant to 42 U.S.C. § 1983 for an alleged violation of his constitutional rights by persons acting under color of state law. At this time Munson's complaint is before the Court for screening pursuant to 28 U.S.C. § 1915A, which provides, in relevant part:

> (a) Screening. – The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> (b) Grounds for Dismissal. – On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint –
> (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted[.]

28 U.S.C. § 1915A. An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint fails to state a claim upon which relief may be granted if it does not plead "enough facts to state a claim to relief that is plausible on

its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Conversely, a complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Although the Court is obligated to accept factual allegations as true, "some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Additionally, courts "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Id*. At the same time, however, the factual allegations of a pro se complaint are to be liberally construed. *See Marshall v. Knight*, 445 F.3d 965, 969 (7th Cir. 2006) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

According to Munson's pro se complaint in this case and the supporting documentation attached thereto, on October 14, 2009, Munson ordered the *Physicians' Desk Reference 2008* ("*PDR*") and the *Complete Guide to Prescription & Non-Prescription Drugs 2009* ("*Complete Guide*") from the Edward R. Hamilton company, a bookseller authorized by the IDOC to do business with IDOC prisoners. Hall claims that he needs the *PDR* and the *Complete Guide* because he takes various prescription medications and requires authoritative medical advice on proper dosages, etc. On November 1, 2009, Munson was informed by Defendant Lisa Shemonic, the publications review officer at Menard, that the *PDR* and the *Complete Guide* are on the disapproved publications list maintained by the IDOC's publications review board and that Munson would not be allowed to have the books. Shemonic's refusal to allow Munson to have the two books was concurred in by Defendant Donald Gaetz, at that time the warden of Menard. It appears that the books subsequently were mailed back to the seller by Shemonic. In November 2010 Munson filed

this lawsuit under 42 U.S.C. § 1983. Munson alleges that the refusal by Shemonic and Gaetz to permit him to have copies of the *PDR* and the *Complete Guide* is a violation of Munson's rights under the First Amendment, the Eighth Amendment, and the Fourteenth Amendment. Named as a Defendant in addition to Shemonic and Gaetz is Michael Randle, the director of the IDOC at the time the incidents giving rise to this case occurred. Munson prays for nominal compensatory damages, punitive damages, and an order directing IDOC officials to let Munson have copies of the *PDR* and the *Complete Guide*.

It is well settled, of course, that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). *See also Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) ("It is . . . certain that . . . prison walls do not form a barrier separating prison inmates from the protections of the Constitution[.]"). However, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977). Accordingly, a prisoner retains only those First Amendment rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). In the context of a prison regulation that restricts a prisoner's First Amendment rights, the regulation is valid so long as it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Conversely, a regulation cannot be sustained where the logical connection to a legitimate interest is "so remote as to render the policy arbitrary or irrational." *Id*. at 89-90. Factors to be considered in evaluating the validity of a prison regulation under the First Amendment include: (1) the existence

of a valid, rational connection between the prison regulation and a legitimate governmental interest; (2) whether a prisoner has alternative means of exercising the right circumscribed by the regulation; (3) the impact of the accommodation of the asserted constitutional right on guards, other prisoners, and institutional resources; and (4) whether there are alternatives to the regulation that can accommodate fully a prisoner's rights at de minimis cost to valid penological interests. *See id*. at 89-91. *See also Pell*, 417 U.S. at 822 ("[C]hallenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law."). "Although the [*Turner*] factors are intended to serve as guides to a single reasonableness standard, 'the first factor looms especially large' because it 'tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions.'" *Waterman v. Farmer*, 183 F.3d 208, 213-14 (3d Cir. 1999) (quoting *Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998)).

In reviewing the validity of prison regulations addition, a court is not to substitute its own judgment for that of prison officials. As the Supreme Court of the United States has noted, "[a]cknowledging the expertise of [prison] officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Thornburgh*, 490 U.S. at 407-08 (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). *See also Bell*, 441 U.S. at 547 ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the

adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." *Turner*, 482 U.S. at 84-85. Furthermore, "[w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Id*. at 85. *See also Sandin v. Conner*, 515 U.S. 472, 482 (1995) (in the context of a due process challenge to conditions of confinement at a state prison, noting that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."). Another significant consideration is that, "[w]here the regulations at issue concern the entry of materials into the prison, . . . a regulation which gives prison authorities broad discretion is appropriate." *Thornburgh*, 490 U.S. at 416. Importantly, the test set out in *Turner* governs judicial review of not only facial challenges to prison regulations but also challenges to specific applications of such regulations as well. In determining whether a specific application of a prison regulation is acceptable, "the question remains whether the prison regulations, as applied to [a prisoner], are 'reasonably related to legitimate penological interests.'" *Shaw v. Murphy*, 532 U.S. 223, 232 (2001) (quoting *Turner*, 482 U.S. at 89). By definition, a prison regulation that is permissible under *Turner* is reasonably related to a legitimate penological interest; thus, if the regulation itself is valid, the only question that remains for a court to decide is whether the actions being challenged are consistent with the regulation. *See id*.

Turning then to the matter at hand, Shemonic and Gaetz denied Munson the *PDR* and the *Complete Guide* on the grounds that Munson's possession of such books could be "detrimental to security, good order, rehabilitation, or discipline or . . . might facilitate criminal activity or be detrimental to mental health." Ill. Admin. Code tit. 20, § 525.230(b)(7).  Also, Shemonic and Gaetz noted that both books deal with prescription drugs, that is to say, controlled substances, a topic that implicates prison security concerns of the highest order.  "Keeping drugs out of prisons is a legitimate penological interest."  *Lindell v. Frank*, No. 02-C-21-C, 2003 WL 23198509, at *13 (W.D. Wis. May 5, 2003) (citing *Thompson v. Souza*, 111 F.3d 694, 701 (9th Cir. 1997)).  *See also Johnson v. Phelan*, 69 F.3d 144, 146 (7th Cir. 1995) (in the context of a constitutional challenge to prison strip searches, noting that prison officials "are entitled to take precautions against drugs and weapons . . . which can be . . . hidden in the rectal cavity").  The *PDR* is, of course, a standard reference work for health care providers concerning prescription drugs:

> The [*PDR*] is a book which identifies all the major prescription drugs on the market, describes the chemical makeup of each drug, indicates the purposes for which a given drug is used, gives warnings as to those persons who should not use a certain drug, and tells what side effects and serious complications might result from the use of a given drug.  This descriptive, prescriptive, and cautionary information is furnished to the publishers of [the *PDR*] by the various drug manufacturers.  The [*PDR*] is supplemented and revised throughout the year through periodic mailings from the publisher.

*Ortho Pharm. Corp. v. Chapman*, 388 N.E.2d 541, 562 (Ind. Ct. App. 1979).  *See also McLain v. Tulane Fleeting Inc.*, Civ. A. No. 93-2165, 1995 WL 2272, at *3 (E.D. La. Jan. 3, 1995) (citing Fed. R. Evid. 803(18)) (the *PDR* is admissible in evidence under the "learned treatises" exception to the hearsay rule).  Although the *PDR* is intended primarily for an audience of health care professionals, not surprisingly the *PDR* also is of interest to laypeople, including persons involved

in illicit drug traffic, whether as users of drugs or dealers in drugs, or both. *See, e.g., State v. Hearold*, 603 So. 2d 731, 733, 735-36 (La. 1992) (in a criminal case involving illicit drug distribution in which a copy of the *PDR* was found in an automobile driven by a suspected drug dealer, and illegal drugs were found near the vehicle, noting testimony by a police officer that the *PDR* is a "'common item' found in association with drug distribution," and concluding that finding a *PDR* in proximity to illicit drugs gives rise to a "reasonable inference" that the owner of the book is a user of such drugs).

With respect to Randle, Munson's complaint is devoid of allegations showing that Randle was personally involved in a deprivation of Munson's constitutional rights, and it is clear that Randle is sued purely by virtue of his position as the onetime director of the IDOC. However, 42 U.S.C. § 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)). As to Shemonic and Gaetz, the Court likewise finds that Munson has failed to state a claim for relief. It appears from Munson's complaint that it is IDOC policy to allow Menard prisoners limited access to reference books about prescription drugs in the prison library, but not to permit prisoners personally to own such books. The Court can imagine many illicit uses to which books like the *PDR* and the *Complete Guide* could be put if IDOC prisoners were allowed unfettered access to such materials, including, inter alia, drug trafficking, drug abuse, and plotting suicide attempts, all of which are, of course, activities highly detrimental to prison security and discipline. Under these circumstances, the Court finds that it is reasonable for the IDOC to restrict Munson's access to books like the *PDR* and the *Complete Guide* to an

examination of such works in the prison library at Menard. *See George v. Smith*, 507 F.3d 605, 608 (7th Cir. 2007) (prison officials can prohibit a prisoner from owning a personal copy of a standard reference book available in the prison library where the book is particularly "worrisome" from the point of view of prison security). As to Munson's claim that his Fourteenth Amendment rights have been violated by Shemonic and Gaetz in refusing to allow him to take possession of books that he purchased, prisoners have no constitutionally-protected property interest in materials that, as here, prison officials legitimately have classed as contraband. *See Anderson v. Fiedler*, 798 F. Supp. 544, 549 (E.D. Wis. 1992) (quoting *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984)) ("[A] prison inmate 'cannot seriously argue' that he has a protected property interest in contraband destroyed as such by prison officials[.]"). Finally, with respect to Munson's claim that the refusal of Shemonic and Gaetz to allow him to possess personal copies of the *PDR* and the *Complete Guide* violates the Eighth Amendment, it is the case, of course, that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). In this case, however, Munson alleges only that he needs the books at issue in order to assure himself that he is being prescribed for correctly by medical staff at Menard. Whatever quibbles Munson has or may come to have with prison doctors' prescription choices for him are not actionable as Eighth Amendment violations. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (noting that, in general, "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim," absent treatment that is "blatantly inappropriate"). The Court finds that Munson's constitutional claims are due to be dismissed.

To conclude, pursuant to 28 U.S.C. § 1915A, the Court finds that Munson's complaint fails to state a claim upon which relief may be granted. Therefore, this action is **DISMISSED with prejudice**. Munson is advised that the dismissal of this case will count as one of his three allotted "strikes" under 28 U.S.C. § 1915(g). The Clerk of Court will enter judgment in accordance with this Order.

**IT IS SO ORDERED.**

DATED: February 17, 2011

/s/ G. Patrick Murphy
G. PATRICK MURPHY
United States District Judge